# EXHIBIT "A"

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

**EQUIPMENT FINANCING AGREEMENT** ("Agreement")

Agreement # __439418-000__

## DEBTOR INFORMATION

| Debtor Name:<br><br>**SV EXPRESS TRANSPORT LLC**<br><br><br>Phone:                Federal Tax ID #: | Debtor's Address:<br>**2727 Parkway CIR** | Collateral Location:<br>**(if different from Debtor's Address)**<br>**2727 Parkway CIR** |
|---|---|---|

## PAYMENT AND TERMS

| **Full Description of Collateral (Include Make Model, Serial Numbers)**<br><br>**2023 East Dump Trailer VIN:1E1D2P580PR083117** | **Collateral Cost:**<br>**$147,564.63** | **Initial Payment**<br>(**Debtor requests that this amount be electronically debited**) |
|---|---|---|
| Term:  **72 Months**<br>(Plus any Prefund or Per diem Period)<br>Monthly Payment Amount:  **$3,035.00** | **Initial Payment Date:**<br><br>03/28/2023 | Fee $:  __$745.00__<br>**(financed)**<br><br>**Total Amount Due:**        **$0.00** |

### TERMS OF EQUIPMENT FINANCING AGREEMENT

Ameris Bank d/b/a Balboa Capital ("Creditor") and Debtor agree as follows:

**1. SECURITY INTEREST:** Debtor hereby grants Creditor a security interest under the Uniform Commercial Code in the above property and equipment (collectively the "Collateral" and individually an "Item of Collateral"). Such security interest is granted to secure performance by Debtor of its obligations hereunder and under any other present or future agreement with Creditor. Debtor shall insure that such security interest is and shall remain a sole first lien security interest. DEBTOR HEREBY AUTHORIZES CREDITOR TO FILE A COPY OF THIS AGREEMENT AS A FINANCING STATEMENT AND APPOINTS CREDITOR OR ITS DESIGNEE AS DEBTOR'S ATTORNEY-IN-FACT TO EXECUTE AND FILE, ON DEBTOR'S BEHALF, FINANCING STATEMENTS COVERING THE COLLATERAL.

**2. COMMENCEMENT DATE:** This Agreement shall commence upon verification of the delivery of the Collateral in a form acceptable to Creditor ("Commencement Date").

**3. NO AGENCY.** DEBTOR ACKNOWLEDGES THAT NO SUPPLIER OR INTERMEDIARY NOR ANY AGENT OF EITHER THEREOF IS AN AGENT OF CREDITOR AND FURTHER THAT NONE OF SUCH PARTIES IS AUTHORIZED TO WAIVE OR ALTER ANY ITEM OR CONDITION OF THIS AGREEMENT. *THE SUPPLIER IS NOT AN AGENT OF CREDITOR'S AND NOTHING THE SUPPLIER STATES CAN AFFECT DEBTOR'S OBLIGATION UNDER THIS AGREEMENT. DEBTOR WILL CONTINUE TO MAKE ALL PAYMENTS UNDER THIS AGREEMENT REGARDLESS OF ANY CLAIM OR COMPLAINT AGAINST SUPPLIER.*

**4. PAYMENTS; PER DIEM EXPENSE REIMBURSEMENT:** Debtor shall repay Creditor the above Monthly Payments in the number of monthly installments indicated above, plus the Per Diem Expense reimbursement as described in this paragraph. The initial Monthly Payment shall be deemed due as of the date indicated above and subsequent Monthly Payments shall be due on the same day of each month thereafter until paid. The first payment we will charge you shall be a pro rata portion of the Monthly Payment based on a daily charge of one-thirtieth (1/30th) or .03333% of the Monthly Payment calculated from number or days from the Commencement Date to the start of the base term (the "Per Diem") and shall be due and payable on a date selected by Creditor.  Debtor acknowledges that: a) Creditor may charge up to thirty (30) days of Per Diem; and b) **the Per Diem is not credited against the Monthly Payments and is in addition to the Term indicated above**.  All Monthly Payments, Per Diem and other payments due under this Agreement or any other agreement with us (collectively "Obligation" or "Obligations") are payable in U.S. dollars, and may be adjusted upward or downward no more than ten percent (10%) to reflect actual costs. All other amounts due thereunder shall be due upon Debtor's receipt of Creditor's invoice. Advance payments, which are the first and last Monthly Payments, shall be applied to the last Monthly Payment in reverse order until exhausted; provided that if there is a default, any payments under this Agreement may be applied to the Obligations at Creditors discretion. In the event Debtor signs this Agreement, but the Agreement is not effected or signed by Creditor, the advanced payments, documentation fee and security deposit may be retained by Creditor so as to compensate Creditor for its processing costs, labor, and other expenses.

Initials __SV__

EFA244Q



The original document is owned by Balboa Capital Corporation and this copy was created on Jan 30, 2023 03:37:21 PM.

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

**5. NON CANCELABLE AGREEMENT;** NO PREPAYMENT, NO OFFSET, THIS AGREEMENT IS NON CANCELABLE BY DEBTOR FOR ANY REASON WHATSOEVER. DEBTOR MAY REPAY THE MONTHLY PAYMENTS ONLY IN ACCORDANCE HEREWITH. ALL PAYMENTS HEREUNDER ARE TO BE MADE WITHOUT OFFSET.

**6. FINANCING.** THIS AGREEMENT IS SOLELY A COMMERCIAL AND BUSINESS FINANCING AGREEMENT. SEE ADDITIONAL TERMS AND CONDITIONS CONTAINED HEREIN WHICH ARE PART OF THIS AGREEMENT.

**7. NO WARRANTIES.   CREDITOR MAKES NO WARRANTY, EXPRESS OR IMPLIED, REGARDING THE COLLATERAL AND ITS FITNESS, MERCHANTABILITY OR PROFITABILITY FOR ANY PURPOSE WHATSOEVER.** DEBTOR AGREES THAT DEBTOR HAS SELECTED THE SUPPLIER AND EACH ITEM OF COLLATERAL BASED UPON DEBTOR'S OWN JUDGMENT AND DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY CREDITOR. CREDITOR DOES NOT TAKE RESPONSIBILITY FOR THE INSTALLATION OR PERFORMANCE OF THE COLLATERAL.

**8. LOCATION; INSPECTION; USE**. Debtor shall keep, or, as to an Item of Collateral which is movable, permanently garage and not remove from the United States, as appropriate, each Item of Collateral in Debtor's possession and control at the Collateral Location or at such other location to which such Item may have been moved with the prior written consent of Creditor, Upon request, Debtor shall advise Creditor as to the exact location of an Item of Collateral. Each Item shall be used solely for commercial or business purposes and operated in a careful and proper manner an in compliance with all applicable governmental requirements, all requirements of insurance policies carried hereunder and all manufacturer's instructions and warranty requirements.

**9. ALTERATIONS; SECURITY INTEREST COVERAGE.** Without Creditor's prior written consent, Debtor shall not make any alterations, additions or improvements to an Item of Collateral which detract from its economic value or functional utility. All additions and improvements made to an Item of Collateral shall be deemed accessions thereto, and shall not be removed if removal would impair the Item's economic value or functional utility. Creditor's security interest shall cover all modifications, accessions, additions to and replacements and substitutions for the Collateral. Debtor will not make any replacements or substitutions without Creditor's prior written consent.

**10. MAINTENANCE.** Debtor shall maintain the Collateral in good repair, condition and working order. Debtor shall cause at its sole expense all repairs required to maintain the Collateral in such condition to be made promptly by qualified parties. Debtor will cause each Item of Collateral for which a service contract is generally available to be covered by such a contract which provides coverage typical as to property of the type involved and is issued by a competent servicing entity,

**11. LOSS AND DAMAGE; CASUALTY VALUE**. In the event of loss, theft, destruction or requisition of or damage to an Item of Collateral from any cause Debtor shall give Creditor prompt notice thereof and shall thereafter place the Item in good repair, condition and working order; provided, however, that if such Item is determined by Creditor to be lost, stolen, destroyed or damaged beyond repair or is requisitioned or suffers a constructive total loss under an insurance policy carried hereunder Debtor shall cause the Collateral to be replaced and shall immediately provide Creditor with information necessary to perfect Creditor's security interest in the replacement Collateral, or shall pay Creditor the "Casualty Value" of such Item which shall equal (a) any amounts due at the time of such payment, and (b) each future Monthly Payment due with respect to such Item discounted at three percent (3%) per annum simple interest from the date due to the date of such payment.

**12. PAYMENT OF OBLIGATIONS:** Payment of the Obligations, the Initial Payment/Total Amount Due, the amounts described in section #14, and any other amounts owed under this Agreement shall be made by electronically withdrawing funds from the bank account listed below in this paragraph, or on which Debtor's deposit check was drawn, or the account from which a cancelled or voided check provided by the Debtor can be drawn, or any other account from which Debtor paid any Obligation under this Agreement. **Debtor initiates each transaction** and authorizes Creditor to debit from any of the foregoing accounts the Obligations, the Initial Payment/Total Amount Due, amounts described in section #14, and any other amounts owed under this Agreement and agrees that Creditor, or its assignees, has the right, but not the obligation, to do so. Debtor acknowledges that, if Creditor assigns this Agreement to a third party, the assignee is also authorized to debit any of the foregoing accounts outlined above. If Debtor would prefer to authorize Creditor to debit another account, fill in the blanks provided below along with a copy of a voided check from the specified account. Debtor understands and agrees that this authorization to electronically withdraw funds from any of the foregoing accounts is irrevocable.

Bank Name: ▉▉▉▉▉▉▉                    Bank City, State: ▉▉▉▉▉▉▉▉▉▉

ABA Routing No: ▉▉▉▉▉▉                 Account No: ▉▉▉▉▉▉▉

Business Name on Account: ▉▉▉▉▉▉▉▉

Street Address on Account: ▉▉▉▉▉▉▉      City, State on Account: ▉▉▉▉▉▉

Initials: _**SV**_

EFA244Q

The original document is owned by Balboa Capital Corporation and this copy was created on Jan 30, 2023 03:37:21 PM.

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

Case 8:26-cv-01613-CAS-PD    Document 1-1    Filed 06/23/26    Page 4 of 14   Page ID #:11

**13. <u>TITLING.</u>** If requested by Creditor, Debtor shall cause an Item of Collateral subject to title registration laws to be titled as directed by Creditor. Debtor shall advise Creditor promptly as to any necessary re-titling. Debtor shall cause all documents of title to be furnished Creditor within sixty (60) days of the date of any titling effected by Debtor. All expenses, fees, costs and charges associated with re-titling to secure Creditors perfected lien rights shall be borne solely by Debtor and reimbursed to Creditor by Debtor.;

**14. <u>TAXES, CHARGES, AND FEES.</u>** Debtor agrees to pay when due all taxes (including personal property tax, fines and penalties) and fees that levied by any State, County or Federal Agency relating to this Agreement or the Collateral. If Creditor pays any of the above taxes on behalf of the Debtor, so as to reimburse Creditor for processing and administrative expenses and time, Debtor will pay a processing fee for each payment. In addition, Debtor also agrees to pay Creditor any UCC filing fees mandated by the Uniform Commercial Code or other law to protect and secure the Collateral and reimburse Creditor for all costs and expenses involved in documenting and servicing this transaction. An inspection of the Collateral will be conducted to evidence the condition of the Collateral and a fee will be charged for this service, which Debtor agrees to reimburse to Creditor. Debtor further agrees to pay Creditor an origination or loan Fee on or before the date the first Monthly Payment is due, the purpose of this fee is to arrange in advance all the necessary funding sources and process credit and paperwork. Debtor also acknowledges that all such fees and charges are in addition to the Monthly Payments, and that all such fees may not only cover Creditors costs but they may also include a profit or administrative expense reimbursement of processing.

**15. <u>INSURANCE</u>**. Debtor agrees to maintain, at Debtor's expense, "Special Form" property insurance protecting the Collateral for its full replacement value, **naming Creditor as a loss payee on a "Creditor's Loss Payable" endorsement**; and public liability insurance, in amounts acceptable to Creditor, naming Creditor as an additional insured (together "Required Insurance"). Debtor must provide Creditor satisfactory written evidence of Required Insurance within thirty (30) days of the commencement date of this Agreement or of any subsequent written request. If Debtor does not do so, Creditor may obtain insurance from an insurer of Creditor's choosing in such forms and amounts as Creditor selects ("Insurance"). Insurance covers the Collateral and Creditor only and not Debtor. Debtor shall pay Creditor periodic charges for Insurance ("Insurance Charges") that include: a premium that may be higher than if Debtor maintained Required Insurance separately; a finance charge of up to the implicit rate of this Agreement on any premium advances made by Creditor or Creditors agents; and billing and processing fees; each of which may generate a profit to Creditor and Creditor agents. If Debtor fails to pay billed Insurance Charges within 30 days of their due date, Creditor may pay them by applying funds paid under this Agreement or debiting Debtor's account under any previously authorized payment. At Creditor's election, in lieu of obtaining or continuing Insurance, Creditor may require Debtor to pay a monthly additional fee up to 2% of the Collateral Cost. This fee is not only calculated with reference to additional risk and constitutes additional profit for Creditor, but represents the basis on which Creditor is willing to forbear from exercising remedies and continue this Agreement without Required Insurance. Debtor will receive no insurance coverage and will not be released from any obligations. **Creditor is not selling insurance.** Creditor will cease charging the additional fee or billing for Insurance 30 days after Debtor provides satisfactory proof of Required Insurance and compliance with this section.

**16. <u>CREDITOR'S PAYMENT.</u>** If Debtor fails to perform any of its obligations hereunder, Creditor may perform such obligation, and Debtor shall (a) reimburse Creditor the cost of such performance and (b) pay Creditor the service charge contemplated in paragraph 14.

**17. <u>INDEMNITY.</u>** Debtor shall indemnify, defend and hold Creditor harmless against any claim, action, liability or expense, including attorneys' fees and court costs, incurred by Creditor related to this Agreement. While it is not anticipated that Creditor shall have any liability for torts related to the Collateral, this indemnity covers tort proceedings including any strict liability claim, any claim under another theory related to latent or other defects and any patent, trademark or service mark infringement claim.

**18. <u>DEFAULT.</u>** Any of the following constitutes an event of default hereunder: (a) Debtor's failure to pay any amount hereunder, within three (3) business days of when due; (b) Debtor's default in performing any other obligation hereunder or under any agreement between Debtor and Creditor; (c) death or judicial declaration of competency of Debtor, if an individual; (d) the filing by or against Debtor of a petition under the Bankruptcy Code or under any other insolvency law or law providing for the relief of debtors, including, without limitation, a petition for reorganization, agreement or extension; (e) the making of an assignment of a substantial portion of its assets by Debtor for the benefit of creditors, appointment of a receiver or trustee for Debtor or for any Debtor's assets, institution by or against Debtor of any other type of insolvency proceeding or other proceeding contemplating settlement claims against or winding up of the affairs of Debtor, Debtor's cessation of active business affairs or the making by Debtor of a transfer of a material portion of Debtor's assets or inventory not in the ordinary course of business; (f) the occurrence of an event described in (c), (d), or (e) as to a guarantor or other surety of Debtor's obligations hereunder, (g) any misrepresentation of a material fact in connection herewith by or on behalf of Debtor; (h) Debtor's default under a lease or agreement providing financial accommodation with a third party or (i) Creditor shall in good faith deem itself insecure as a result of a material adverse change in Debtor's financial condition or otherwise.

**19. <u>REMEDIES</u>**. Upon the occurrence of an event of default Creditor shall have the right, options, duties and remedies of a secured party, and Debtor shall have the rights and duties of a Debtor, under the Uniform Commercial Code (regardless of whether such Code or a law similar thereto has been enacted in a jurisdiction wherein the rights or remedies are asserted) and in connection therewith Creditor may: (a) sue for and recover from Debtor the sum of: (1) all unpaid Monthly Payments and other payments, including late charges and interest, due under this Agreement then accrued, all accelerated future payments due through the last day of the term of this Agreement; (2) any and all costs or

Initials [ SV ]

EFA244Q

The original document is owned by Balboa Capital Corporation and this copy was created on Jan 30, 2023 03:37:21 PM.

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

Case 8:26-cv-01613-CAS-PD    Document 1-1    Filed 06/23/26    Page 5 of 14    Page ID #:12

expenses paid or incurred by Creditor in connection with the repossession, holding, repair, reconditioning and subsequent sale, lease or other disposition of the Collateral, including but not limited to attorney's fees and costs, whether or not litigation is commenced; (3) all other costs or expenses paid or incurred by Creditor at any time in connection with the execution, delivery, administration, amendment and enforcement or exercise of any of the Creditor's rights and remedies under this Agreement, including, but not limited to, attorneys' fees and costs, whether or not litigation is commenced, and taxes imposed by any governmental agency; (4) any actual or anticipated loss of federal or state tax benefits to Creditor (as determined by Creditor) resulting from Debtor's default or Creditor's repossession or disposition of the Collateral; and (5) any and all other damages proximately caused by Debtor's default; (b) declare the Casualty Value or such lesser amount as may be set by law immediately due and payable with respect to any or all Items of Collateral without notice or demand to Debtor; (c) take possession of and, if deemed appropriate, render unusable any or all Items of Collateral, without demand or notice, wherever located, without any process of law and without liability for any damages occasioned by such taking of possession including damages to contents; (d) require Debtor to assemble any or all Items of Collateral at a location in reasonable proximity to their designated location hereunder, (e) upon notice to Debtor required by law, sell or otherwise dispose of any Items of Collateral, whether or not in Creditor's possession, in a commercially reasonable manner at public or private sale and apply the net proceeds of such sale after deducting all costs of such sale, including, but not limited to, costs of transportation, repossession, storage, refurbishing, advertising and brokers fees, to the obligations of Debtor hereunder with Debtor remaining liable for any deficiency and with any excess being returned to Debtor or (f) utilize any other remedy available under the Uniform Commercial code or otherwise to Creditor. All remedies are cumulative. Any sale may be adjourned by announcement at the time and place appointed for such sale without further published notice, and Creditor may, if permitted by law, bid at any such sale.

20. **LITIGATION EXPENSES.** Debtor shall pay Creditor its costs and expenses not offset as provided in paragraph 19, including repossession and attorneys' fees and court costs, incurred by Creditor in enforcing this Agreement. This obligation includes the payment of such amounts whether an action is filed and whether an action which is filed is dismissed.

21. **ASSIGNMENT.** Without the prior written consent of Creditor, Debtor shall not sell, lease or create or allow any lien other than Creditor's security interest against an Item of Collateral or assign any of Debtor's obligations hereunder. Debtor's obligations are not assignable by operation of law. Consent to any of the foregoing applies only in the given instance. Creditor may assign, pledge or otherwise transfer any of its rights **but none of its obligations** hereunder without notice to Debtor. If Debtor is given notice of any such assignment, Debtor shall acknowledge receipt thereof in writing and shall thereafter pay any amounts due hereunder as directed in the notice. The rights of an assignee to amounts due hereunder shall be free of any claim or defense Debtor may have against Creditor, and Debtor agrees not to assert against an assignee any claim or defense which Debtor may have against Creditor. Subject to the foregoing, this Agreement inures to the benefit of, and is binding upon, the heirs, legatees, personal representatives, successors and assigns of the parties.

22. **PERSONAL PROPERTY.** Debtor shall mark the Collateral or its location as requested by Creditor to indicate Creditor's security interest. As between the parties the Collateral shall at all times be deemed personal. Debtor will provide Creditor any real property waivers requested by Creditor as to the real property where an Item of Collateral is or is to be located.

23. **LATE PAYMENT.** If Debtor fails to pay any amount to be paid hereunder within three (3) days of when due, Debtor agrees to pay us (a) eighteen percent (18%) of each such late payment (to the extent permitted by law) (b) amounts Creditor pays others in connection with the collection of the payment and (c) interest on such unpaid amount from the date due until paid at the lesser of eighteen percent (18%) per annum or the highest rate permitted by applicable law. No more than a single charge under subparagraph (a) will be due in any given month.

24. **SECURITY INTEREST RELEASE.** At such time as there is no outstanding obligation secured hereby (including obligations under other agreements contemplated under paragraph 1), Creditor shall provide Debtor such termination statements related to the Collateral as Debtor shall reasonably request. Debtor shall be responsible for the filing of each such UCC3 termination statement at its expense.

25. **ADDITIONAL DOCUMENTS.** Debtor shall provide to Creditor such financing statements and similar documents as Creditor shall request. Debtor authorizes Creditor, where permitted by law, to make filings of such documents without Debtor's signature. Debtor shall reimburse Creditor for all search and filing fees incurred by Creditor related hereto.

26. **NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier. Notice to Debtor will be sent to Debtor's last known address in Creditor's records for this Loan. Notice to Creditor may be sent to, Ameris Bank d/b/a Balboa Capital, 575 Anton Blvd, 12ᵗʰ Floor, Costa Mesa CA 92626.

27. **GENERAL. This Agreement as well as the delivery and acceptance receipt(s) for the Collateral constitute the entire agreement between the parties, and supersede all prior negotiations, written or oral, including any written offer or proposal describing and/or summarizing the terms of any proposed lease/financing. This Agreement cannot be modified except in writing signed by the party**

Initials _____ SV

The original document is owned by Balboa Capital Corporation and this copy was created on Jan 30, 2023 03:37:21 PM.

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

against who enforcement is sought. **Debtor represents to Creditor that it shall not allege in any court proceeding that the parties entered into an oral modification of this Agreement, and further agrees, that in any event, any such oral modification shall not be enforceable unless it is reduced to a writing signed by the party against whom enforcement is sought**. Any waiver by Creditor must be in writing, and forbearance shall not constitute a waiver. If there is more than one Debtor named in this Agreement, the liability of each shall be joint and several. The titles to the paragraphs of this Agreement are solely for the convenience of the parties and are not an aid in the interpretation. Any provision declared invalid shall be deemed severable from the remaining provisions which shall remain in full force and effect. Time is of the essence of this Agreement. The obligations of Debtor shall survive the release of the security interest in the Collateral.

28. **DEBTOR'S WARRANTIES.** DEBTOR CERTIFIES AND WARRANTS:(a) THE FINANCIAL AND OTHER INFORMATION WHICH DEBTOR HAS SUBMITTED, OR WILL SUBMIT, TO CREDITOR IN CONNECTION WITH THIS AGREEMENT IS, OR SHALL BE AT TIME OF SUBMISSION, TRUE AND COMPLETE; (b) THIS AGREEMENT HAS BEEN DULY AUTHORIZED BY DEBTOR AND UPON EXECUTION BY DEBTOR SHALL CONSTITUTE THE LEGAL, VALID AND BINDING OBLIGATION, CONTRACT AND AGREEMENT OF DEBTOR ENFORCEABLE AGAINST DEBTOR IN ACCORDANCE WITH ITS TERMS; AND (c) EACH SHOWING PROVIDED BY DEBTOR IN CONNECTION HEREWITH MAY BE FULLY RELIED UPON BY CREDITOR NONWITHSTANDING ANY TECHNICAL DEFICIENCY IN ATTESTATION OR OTHERWISE. THE PERSON EXECUTING THIS AGREEMENT ON BEHALF OF DEBTOR WARRANTS THAT PERSON'S DUE AUTHORITY TO DO SO. DEBTOR FURTHER WARRANTS THAT EACH ITEM OF COLLATERAL SHALL AT THE TIME CREDITOR FUNDS THE TOTAL ADVANCE BE OWNED BY DEBTOR FREE AND CLEAR OF LIENS OR ENCUMBRANCES AND BE IN GOOD CONDITION AND WORKING ORDER.

29. **GOVERNING LAW (EXCLUSIVE AND MANDATORY TO CALIFORNIA).** Our relationship (including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement) will be exclusively governed by, and this Agreement will be exclusively construed in accordance with California law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be exclusively governed by such laws.

30. **CONSENT TO EXCLUSIVE AND MANDATORY JURISDICTION AND VENUE OF CALIFORNIA.** Debtor submits to the jurisdiction of California and agrees that any action or proceeding to enforce this Agreement, or any action or proceeding arising out of or related to this Agreement will be exclusively commenced, initiated and litigated in the California State Courts of Orange County California and/or the United States District Court for the Central District of California, Santa Ana Division. Debtor understands and agrees that (i) Creditor is located in Costa Mesa, California, (ii) Creditor makes all credit decisions from Creditor's office in Costa Mesa, California, (iii) this Agreement is made and deemed to be performed in Costa Mesa, California (that is, no binding contract will be formed until Creditor receives and accepts Debtor's signed Agreement in Costa Mesa, California) and (iv) Debtor's payments are not accepted until received by Creditor in Costa Mesa, California. Creditor, at its sole discretion, may commence any action seeking judicial intervention to recover the Collateral in any State Court where the Collateral may be physically located.

31. **COUNTERPARTS AND FACSIMILE SIGNATURES.** If this Agreement was sent electronically, Debtor hereby warrants that this Agreement has not been altered in any way. Any alteration or revision to any part of this Agreement or any attached documents will make all alterations or revisions non-binding and void. Only one counterpart of this Agreement and of each Schedule, Addenda, or Exhibit attached hereto shall bear our signature and shall be marked "Original". To the extent that any Equipment Financing Agreement, Schedule, Addenda or Exhibit hereto constitute chattel paper (as that term is defined by the Uniform Commercial Code), a security interest may only be created in this Agreement, Schedule, Addenda or Exhibit that bears our signed signature and is marked "Original". This Agreement and any documents pertaining to this Agreement may be executed in counterparts. Delivery of this Agreement bearing a facsimile signature, electronic signature, or other signature which is not in ink, shall have the same force and effect as if this document bore an original ink signature. The electronic transmission of this Agreement shall have the same force and effect as delivery of an original and shall be legally admissible under the best or original evidence rule. DEBTOR WARRANTS AND REPRESENTS THIS DOCUMENT IS A COMPLETE AND FULLY NEGOTIATED VERSION, IT CONTAINS NO BLANK SPACES AND REPRESENTS THE FINAL AND AGREED UPON TERMS PRIOR TO SIGNATURE EXECUTION.

| (CREDITOR) | (DEBTOR) |
|---|---|
| **Ameris Bank d/b/a Balboa Capital**<br>**575 Anton Blvd**<br>**12th Floor**<br>**Costa Mesa, CA 92626** | **SV EXPRESS TRANSPORT LLC**<br>**2727 Parkway CIR** |
| By: _Joseph DeLeon_   Jan 30, 2023 3:36:56 PM PST | By: _STIVI VUKTILAJ_   Jan 27, 2023 11:00:29 AM PST |
| Vice President | Name: STIVI VUKTILAJ<br>Title: Managing Member |
| Date: 01/30/2023 | Date: 01/27/2023    Home Phone: ████████ |

EFA244Q

The original document is owned by Balboa Capital Corporation and this copy was created on Jan 30, 2023 03:37:21 PM.

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

Case 8:26-cv-01613-CAS-PD    Document 1-1    Filed 06/23/26    Page 7 of 14    Page ID #:14

# DISBURSEMENT AUTHORIZATION

TO:  Balboa Capital Corporation

The undersigned hereby certifies that all the property described below (the "Collateral"), which is to be financed for the undersigned pursuant to the Equipment Financing Agreement No. 439418-000  dated as of  01/30/2023  , (the "Agreement") between **Balboa Capital Corporation** and the undersigned, as Debtor, has been furnished to the undersigned, that delivery and installation has been fully completed and that the Collateral is acceptable in all respects to the undersigned.

In view of the above, the undersigned hereby authorizes and requests you to pay for the Collateral in accordance with the terms of any purchase orders the undersigned may have issued for the same and/or to pay the undersigned the advance amount to the extent the undersigned has previously paid for the Collateral, as appropriate. The undersigned acknowledges that you are relying upon this executed Delivery and Acceptance Certificate in so doing.  Debtor hereby authorizes Creditor to disburse the Collateral Cost and the Total Fees/Charges Financed as follows:

| Payee Name | Amount |
|---|---|
| M & K Trailer Centers | $143,876.16 |
| Balboa Capital Per Diem | $2,943.47 |
| Balboa Capital Doc Fee | $745.00 |
| | |
| | |
| | |
| Total Amount to be Disbursed | $147,564.63 |

**COLLATERAL - SEE COLLATERAL DESCRIPTION ON THE AGREEMENT AND/OR ON THE ATTACHED EXHIBIT "A".**

The undersigned recognizes that by executing this Delivery and Acceptance Certificate the undersigned's non-terminable Monthly Installment Payment obligation under the Agreement will commence. The undersigned reaffirms its understanding that the Agreement is solely a financing agreement and that, accordingly, you have made no express warranties as to the Collateral of any other matter and that there are no related implied warranties created by law and further that, accordingly, the undersigned's obligation to pay amounts due under the Agreement will not be affected by any problems the undersigned experiences with the Collateral or any similar or dissimilar occurrence as also set forth in the Agreement.

**Debtor Name:**  **SV EXPRESS TRANSPORT LLC**

sign ➤ **By:**  *eSigned By:* _STIVI VUKTILAJ_  Jan 27, 2023 11:00:44 PST

**Name:**  STIVI VUKTILAJ

**Title:**  Managing Member

**Date:**  01/27/2023

**Date Collateral accepted by Debtor**  01/27/2023  **(Date)**

**BILLING/PROCESSING INFORMATION:**

Email Address for Invoices:  svexpresstransport@gmail.com

Cell Number:  248-843-1595

Attention To:  STIVI VUKTILAJ

STATE WHERE VEHICLE WILL BE TITLED :  MI

**"Delivery of this document bearing a facsimile signature or signatures shall have the same force and effect as if the document bore an original signature."**

EFA1679B



The original document is owned by Balboa Capital Corporation and this copy was created on Jan 30, 2023 03:37:21 PM.

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

Case 8:26-cv-01613-CAS-PD    Document 1-1    Filed 06/23/26    Page 8 of 14    Page ID
#:15

## EARLY BUYOUT ADDENDUM TO
## EQUIPMENT FINANCE AGREEMENT NO. <u>439418-000</u>

This Early Buyout Option Addendum (hereinafter "Addendum") to Equipment Finance Agreement No. <u>439418-000</u> (hereinafter "Agreement") is made by and between Balboa Capital Corporation (hereinafter "Creditor, and <u>SV EXPRESS TRANSPORT LLC</u> (hereinafter "Debtor")..

At Creditor's sole discretion, and so long as Debtor is not in default of any of its obligations under the Agreement, the Debtor shall have the option to exercise this Early Buyout Option ("EBO"). Debtor may prepay in full, but not in part, all Monthly Installment Payments and other payments due under the Agreement prior to the end of the scheduled loan term, which amount will be calculated as follows:

**Early Buyout Option**:

1. If Debtor requests to exercise this EBO **before** Creditor has received the 12th scheduled Monthly Installment Payment, the EBO will be calculated at an amount equal to the sum of all remaining Monthly Installment Payments under the Agreement and any other payments, taxes, or fees owed under the Agreement.
2. If Debtor requests to exercise this EBO **after** Creditor has received the 12th scheduled Monthly Installment Payment, the EBO will be calculated at an amount equal to the net investment (calculated as the remaining stream of payments due under the Agreement minus all unearned interest), plus a termination fee in the amount of $500.00. This cost is an offset of the labor and administrative costs associated with lien releases and terminating this transaction.

If Debtor elects not to exercise this option, the Agreement will continue for the full term as indicated in the Agreement.

Except as expressly set forth herein, the terms, definitions, and conditions of the Agreement and any other written agreements entered into and executed by and between Creditor and Debtor are incorporated herein by this reference as if set forth in full and shall remain in full force and effect.

**"Delivery of this document bearing a facsimile or electronic signature or signatures shall have the same force and effect as if the document bore an original signature."**

IN WITNESS WHEREOF, the parties hereto, by their authorized signatories, have executed this Addendum at the date set forth below their respective signatures.

CREDITOR:

Balboa Capital Corporation

eSigned By:
By: _*Joseph DeLeon*_
Jan 30, 2023 3:37:10 PM PST

Vice President

Date: 01/30/2023

DEBTOR:

SV EXPRESS TRANSPORT LLC

**sign** eSigned By:
By: _STIVI VUKTILAJ_
Jan 27, 2023 11:04:00 AM PST

Name: STIVI VUKTILAJ

Title: Managing Member

Date: 01/27/2023

1654



Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

Case 8:26-cv-01613-CAS-PD     Document 1-1     Filed 06/23/26     Page 9 of 14   Page ID #:16



CREDITOR:  BALBOA CAPITAL CORPORATION                    Equipment Financing Agreement Number:   **439418-000**

## VEHICLE ADDENDUM – I-A

ADDENDUM TO EQUIPMENT FINANCING AGREEMENT OF EQUIPMENT DATED  01/30/2023

THE TERM "VEHICLE" AS USED HEREIN SHALL BE DEEMED TO REFER
TO AN ITEM OF EQUIPMENT AS DEFINED IN THE EQUIPMENT FINANCING AGREEMENT

HEAVY VEHICLE USE TAX (Federal Highway Use Tax):  Debtor will file all returns and pay all (Federal) Heavy Vehicle Use Tax, which may be assessed or due on each Vehicle and Debtor agrees to indemnify Creditor for such taxes.  In the event of default any expenses incurred will be included as Equipment Financing Agreement damages and due from the Debtor.

OBLIGATION TO PAY MISCELLANEOUS CHARGES:  Debtor agrees to pay all storage charges, parking charges and fines.  Debtor will pay any fees (including Vehicle registration and inspection fees) or taxes which may be imposed with respect to each Vehicle by any governmental authority.  In the event of default any expenses incurred will be included as Equipment Financing Agreement damages and due from the Debtor.

TITLING AND REGISTRATION: Debtor is the owner of the Equipment and Debtor guarantees that physical titling of the Equipment will be accomplished in a timely manner. Each Vehicle subject to this Equipment Financing Agreement shall bear license plates and the title thereto shall be registered in the name of Debtor.  Annual registration and license fees shall be paid by Debtor. Debtor agrees to provide to Creditor the original title documentation or DMV receipt. This will be provided within 30 days of when Debtor receives it from the titling authority.  If Debtor fails to do so, Debtor will be in default of this Agreement.  Debtor further agrees to pay a month to month unobtained titling fee if we have not received the correct transferred title in our office and agree to indemnify Creditor from any damage or loss we incur from Debtor's  failure.

**sign ➤** _____SV_____ **(initial)** Debtor, at Debtor's sole cost, will obtain and maintain all registrations, titling, plates, permits and licenses necessary for use of the Equipment in Debtor's business, and in conformance with the laws of the state within in the principal place of business of the Debtor is located or in the principal place where the Vehicle is garaged.  Debtor further grants Creditor limited power of attorney to sign off on any title documentation in case of any repossession or termination.  Debtor also grants Creditor security interest in the equipment if this agreement is deemed a secured transaction and Debtor authorizes Creditor to record a UCC-1.

INSURANCE:  Debtor shall procure and maintain in full force and effect at all times, at Debtor's expense, with a responsible insurance company acceptable to Creditor, insurance coverage for the maximum insurable value of the equipment insuring Debtor and Creditor, as their interests may appear, against liability for death, bodily injury and property damage resulting from ownership, maintenance, use or operation of the equipment, with minimum coverage per occurrence as follows:

Minimum limits for each vehicle to be maintained by Debtor:

| | | | |
|---|---|---|---|
| Bodily injury liability per individual | $500,000.00 | Fire, Theft and Comprehensive | Full Value |
| Bodily injury liability per accident | $500,000.00 | Collision Value Deductible (deductible part to be paid by Debtor) | |
| Property damage liability | $250,000.00 | | |
| **OR** Combined Single Limits | $750,000.00 | | |

Such continuous insurance coverage shall be provided for the period from delivery of the first item of equipment to Debtor to the date of termination of this Equipment Financing Agreement.  Debtor shall provide Creditor copies of the insurance policies or other evidence of the maintenance of such insurance. Creditor **must** be named on the policy as **"additional insured"** and **"loss payee"**.

The following shall constitute an additional Event of Default under the Equipment Financing Agreement: "expiration or cancellation of any policy of insurance agreed to be paid for by Debtor, or the cessation in force according to its original terms of any such insurance, or of any extension or renewal thereof, during the entire term of this Equipment Financing Agreement".

EXCEPT IN THE EVENT OF DIRECT CONFLICT BETWEEN THIS ADDENDUM AND THE ABOVE REFERENCED EQUIPMENT FINANCING AGREEMENT, THE PROVISIONS OF THIS ADDENDUM SUPPLEMENT SAID EQUIPMENT FINANCING AGREEMENT AND SHALL NOT BE DEEMED TO MODIFY, REPLACE, OR CANCEL ANY PROVISION OF SAID EQUIPMENT FINANCING AGREEMENT, IN THE EVENT OF CONFLICT BETWEEN THIS ADDENDUM AND SAID EQUIPMENT FINANCING AGREEMENT, THE PROVISIONS OF THIS ADDENDUM SHALL CONTROL.

**"Delivery of this document bearing a facsimile signature or signatures shall have the same force and effect as if the document bore an original signature."**

**CREDITOR:**
**BALBOA CAPITAL CORPORATION**

By: _____ *Joseph DeLeon* _____
                                    Jan 30, 2023 3:37:20 PM PST

Title:   Vice President

Date:   01/30/2023

**DEBTOR:**
 **SV EXPRESS TRANSPORT LLC**

**sign ➤** By: _____ *STIVI VUKTILAJ* _____
                                    Jan 27, 2023 11:04:35 AM PST

Name:   STIVI VUKTILAJ

Title:   Managing Member

Date:   01/27/2023

EFA255C



Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

Case 8:26-cv-01613-CAS-PD     Document 1-1     Filed 06/23/26     Page 10 of 14     Page ID
#:17



# LLC RESOLUTION

At a duly constituted meeting of the Members of
SV EXPRESS TRANSPORT LLC                                                                    held
on 01/27/2023 , the following resolution was unanimously passed:

RESOLVED, that STIVI VUKTILAJ in his/her capacity as Managing Member
is authorized for, on behalf of and in the name of this Limited Liability Company, to negotiate,
procure and execute such Equipment Financing Agreements, which in his opinion are necessary or
advisable to effectuate the most favorable interests of the Limited Liability Company, and the
execution of such documents by said officer shall be conclusive evidence of his approval thereof.

IN WITNESS WHEREOF, I have affixed my name as <u>Member</u> of said Limited Liability Company
and have caused the company seal of the Limited Liability Company to be hereunto affixed this on
01/27/2023

**"Delivery of this document bearing a facsimile signature or signatures shall have the same force and effect as
if the document bore an original signature."**

eSigned By: *STIVI VUKTILAJ*                 Jan 27, 2023 11:04:47 AM PST

Member

Print Name: STIVI VUKTILAJ

Seal

EFA331

The original document is owned by Balboa Capital Corporation and this copy was created on Jan 30, 2023 03:37:22 PM.





**29275 Citrin Dr. | Romulus, MI 48174**

# EQUIPMENT PURCHASE AGREEMENT

**CLEAR FORM**

| DELIVERY DATE | |
|---|---|

## PURCHASER INFO

| PURCHASER | | |
|---|---|---|
| SV EXPRESS TRANSPORT LLC | | |

| ADDRESS | | |
|---|---|---|
| 2727 PARKWAY CIR | | |

| CITY | STATE | ZIP |
|---|---|---|
| SAINT CLAIR SHORES | MI | 48080 |

| CELL PHONE | BUSINESS PHONE |
|---|---|
| | |

| EMAIL |
|---|
| |

| MC/EXEMPTION/D.O.T. DRIVERS LICENSE NO. |
|---|
| |

| ADDITIONAL INFORMATION: (Lessee) |
|---|
| |

## LIEN HOLDER INFO

| LIEN HOLDER(S) |
|---|
| |

## WORK TO BE DONE BEFORE DELIVERY

**WARRANTY DESCRIPTION** (PRICE IN LINE #6)   SHURCO TARP & DURAPRO INCLUDED

| | |
|---|---|
| a. | $ |
| b. | $ |
| c. | $ |
| d. | $ |

## SALESPERSON / DATE

| SALESPERSON | DATE |
|---|---|
| AARON MEYERING | 12/7/22 |

## TRUCK(S) SOLD INFO

| | | YEAR | MAKE | MODEL | MILEAGE |
|---|---|---|---|---|---|
| ✔ | NEW | 2024 | EAST | GENESIS LEAD | N/A |
| | USED | | | | |

| VEHICLE IDENTIFICATION NUMBER(S) |
|---|
| QUOTATION 3300, 5 AXLE ALUMINUM FRAME ALUMINUM BODY DUMP TRAILER, 30'11" 1E1D2P580PR083117 |

| ENGINE | TRANSMISSION |
|---|---|
| | |

| STOCK NO. | CAB CONFIGURATION |
|---|---|
| N/A | |

## TRADE-IN INFO

| YEAR | MAKE | MODEL | STOCK NO. |
|---|---|---|---|
| | | | |

| VEHICLE IDENTIFICATION NUMBER |
|---|
| |

| APPRAISED VALUE | TRADE-IN ALLOWANCE |
|---|---|
| | |

| CURRENT MILEAGE READING | BALANCE OWED (10-DAY PAYOFF) |
|---|---|
| | |

## PRICE OF EQUIPMENT

| | |
|---|---|
| 1. SUBTOTAL OF WORK TO BE DONE BEFORE DELIVERY (a, b, c & d above) | $ 0 |
| 2. BASE PRICE OF EQUIPMENT (WITHOUT FET) | $ 121662 |
| 3. DEALER DOCUMENT FEE | $ 0 |
| 4. SALES TAX (STATE/LOCAL) | $ 7299.72 |
| 5. FEDERAL EXCISE TAX | $ 14599.44 |
| 6. ADD-ONS NOT SUBJECT TO FET (Warranty, APU) | $ 0 |
| 7. TITLE FEE | $ 15 |
| 8. PLATE FEE | $ 300 |
| 9. TOTAL PRICE, per piece of equipment | $ 143876.16 |
| 10. PIECES OF EQUIPMENT ORDERED ( 1 ) | |
| 11. TOTAL AMOUNT OF AGREEMENT | $ 143876.16 |
| 12. DEPOSIT AMOUNT (Receipt #_____) | $ 000 |
| 13. BALANCE OF TRADE | $ |
| 14. FINAL AMOUNT DUE ON DELIVERY | $ 143876.16 |

THIS EQUIPMENT PURCHASE AGREEMENT ("Agreement") IS NOT BINDING UNTIL SIGNED BY THE PURCHASER AND AN AUTHORIZED DEALER EMPLOYEE.

UNLESS A SEPARATE WARRANTY OR SERVICE CONTRACT IS FURNISHED BY THE DEALER TO THE PURCHASER, THIS EQUIPMENT IS SOLD "**AS IS**" WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED. PURCHASER IS SOLELY RESPONSIBLE FOR THE COSTS TO REPAIR OR CORRECT ANY DEFECTS IN USED EQUIPMENT WHICH EXIST AT OR AFTER THE TIME OF PURCHASE.

**SUBJECT TO PRIOR SALES:** NO EQUIPMENT WILL BE HELD FOR MORE THAN 3 BUSINESS DAYS, AWAITING CREDIT APPROVAL.

I HAVE READ AND AGREE TO THE TERMS AND CONDITIONS OF THE AGREEMENT ON THE FRONT AND BACK OF THIS FORM AND ACKNOWLEDGE RECEIPT OF THE AGREEMENT.

X _____ / _____ / _____
PURCHASER'S SIGNATURE                              DATE

X _____ / _____ / _____
DEALER/MANAGER SIGNATURE                        DATE

X _____ / _____ / _____
GUARANTOR/CO-PURCHASER SIGNATURE              DATE

**SEE REVERSE SIDE FOR ADDITIONAL TERMS AND CONDITIONS**

November 2021

# ADDITIONAL TERMS AND CONDITIONS

1. DEFINITIONS. The capitalized terms as used in this Agreement, have the following meanings: (a) "Dealer" means the entity on the face of this Agreement which becomes a party to this Agreement through its acceptance by an authorized Dealer employee; (b) "Purchaser" means the party initiating this Agreement, as identified on the face of the Agreement; (c) "Manufacturer" means the corporation that manufactured the chassis, trailer or equipment, as defined below. Purchaser and Dealer acknowledge that Dealer is not an agent for the Manufacturer. Dealer and Purchaser are the sole parties to this Agreement. Reference to the Manufacturer is solely for the purpose of explaining the relationship between the Dealer and Manufacturer; and (d) "Equipment" includes but is not limited to new and used motor vehicle(s), trailer(s), recreational vehicle(s), vessel(s), and any other equipment described in the Agreement which the Purchaser purchases or uses as a trade-in.

2. PRICE OF EQUIPMENT/ PRICE CHANGES: Equipment is ordered from the Manufacturer and is subject to availability. Market conditions, Manufacturer's acceptance of Dealer's Equipment order, Equipment allocated to Dealer, Manufacturer and third party imposed price increases or surcharges may impact Equipment price. With written notice, Dealer may notify Purchaser of an Equipment price increase up to a maximum of 5% of the purchase price. If the price increase exceeds 5% of the purchase price, Dealer may: (i) terminate this Agreement because it is not viable to sell the Equipment or (ii) provide Purchaser with an option to accept or reject the price increase, with 7 days written notice to Dealer If Purchaser rejects or does not timely accept the price increase in writing, Dealer may enforce or terminate the Agreement, subject to Paragraphs 10 and 17 of this Agreement. If Purchaser timely rejects the price increase in writing or Dealer terminates this Agreement, Dealer shall return Purchaser's deposit, if any, which is Purchaser's sole remedy against Dealer. Purchaser waives all other remedies.

3. PURCHASER'S RESPONSIBILITIES UPON PURCHASE OF EQUIPMENT. The Equipment purchase price is tailored specifically for the sale of Equipment to Purchaser and is based upon a price offered to Dealer by the Manufacturer. Because of this, Purchaser may not directly or indirectly sell any piece of or all of the Equipment to a third party for 12 months from the date of purchase. If Purchaser sells any piece of or all of the Equipment prior to 12 months from the date of the purchase, Purchaser must pay Dealer $2,400.00, for each piece of Equipment, plus any Manufacturer imposed fees and charges. Purchaser must pay the fees within 5 business days after Dealer invoices Purchaser. If Purchaser does not pay the fees, Dealer may consider Purchaser's failure to pay, a breach of the Agreement. The obligations in this Paragraph survive the purchase of Equipment and termination of this Agreement.

4. MANUFACTURER'S DESIGN CHANGES. If a Manufacturer changes or modifies the design of or any part or accessory of any new piece of Equipment after the order has been entered by the Dealer, Purchaser has no claim or right against Dealer, if Purchaser's new Equipment does not contain the changes or modifications. Dealer has no obligation to implement the changes or modifications to new Equipment.

5. DELAYS IN DELIVERY. Dealer will notify Purchaser when Equipment is ready for delivery, which shall take place at a location and date scheduled by Dealer. If Purchaser does not take delivery within 10 days from the scheduled delivery date, this Agreement may be terminated by Dealer. In addition to any other remedies provided by law, Dealer may elect to sell the Equipment and is entitled to remedies provided in Paragraphs 10 and 17 of this Agreement. Without limiting the foregoing, Dealer shall not be liable for any damages resulting from a failure to deliver or other delays caused by the Manufacturer, accidents, fire, pandemics or other causes beyond the Dealer's control. Equipment is ordered from the Manufacturer and deliveries are contingent on Manufacturer's acceptance of the order, Equipment allocated to Dealer and market conditions, which are beyond Dealer's control. Dealer may determine it cannot deliver the Equipment, terminate this Agreement and return any deposit provided by Purchaser, which is Purchaser's sole remedy against Dealer. Purchaser waives all other remedies.

6. USED EQUIPMENT TRADE-IN APPRAISAL. If used Equipment is part of the purchase and delivery of the used Equipment will not occur until the new Equipment is delivered, Dealer may reappraise Purchaser's used Equipment, once delivered. The reappraisal amount shall be the amount credited for the used Equipment. If Purchaser is dissatisfied with the reappraisal, Purchaser may keep the trade in vehicle and pay the full purchase price for the Equipment.

7. USED EQUIPMENT/ TRADE-IN TITLE. Purchaser represents and warrants the following to Dealer: (a) used Equipment delivered to the Dealer is properly titled to Purchaser; (b) Purchaser has the right to sell or otherwise convey used Equipment; and (iii) used Equipment is free and clear of liens or encumbrances, except as may be noted on the title or on the front of this Agreement. Purchaser shall provide title documents sufficient for Dealer to obtain title. Purchaser agrees if any of its representations or warranties in this Paragraph are untrue in any respect, Purchaser shall immediately, upon request by Dealer, repurchase the used Equipment from Dealer for a purchase price equal to the amount of the trade-in allowance, PLUS Dealer's cost for any re-conditioning, service work and other investment made by Dealer in the Equipment.

8. USED EQUIPMENT TRADE-IN/ EMISSIONS SYSTEMS. If Purchaser delivers used Equipment as part of the purchase, Purchaser represents and warrants the emission system(s) has/have not been altered, removed or otherwise defeated or disabled and is/are fully functioning as designed by Manufacturer. Purchaser agrees if any of its representations or warranties about the emissions systems are untrue in any respect, Purchaser shall immediately, upon request by Dealer, repurchase the Equipment from Dealer for a purchase price equal to the amount of the trade-in allowance, PLUS Dealer's cost for any re-conditioning, service work and other investment made by Dealer in the Equipment.

9. ABSOLUTE NON-TERMINABLE OBLIGATION. PURCHASER'S OBLIGATION TO PAY THE PURCHASE PRICE AND TAKE DELIVERY OF THE EQUIPMENT IS ABSOLUTE, UNCONDITIONAL AND IS NOT SUBJECT TO ABATEMENT, REDUCTION, SETOFF, DEFENSE, COUNTERCLAIM AND WITHOUT PRIOR NOTICE OR DEMAND.

10. PURCHASER'S REFUSAL TO ACCEPT DELIVERY/ PURCHASE EQUIPMENT. If Purchaser fails to accept delivery of or purchase any piece of or all of the Equipment, this Agreement will be terminated. Dealer may retain any payments or deposits made by Purchaser for Equipment as liquidated damages, not as a penalty. In addition to any available legal remedies, Dealer may elect to: (i) sell the Equipment to another customer or (ii) require the Purchaser to purchase the Equipment "AS IS." If the Agreement is terminated pursuant to this Paragraph, Purchaser is responsible for compensating Dealer at the Daily Treasury Interest Rate, plus 6% per month, to cover Dealer costs incurred for floor plan interest and costs to insure the Equipment. If used Equipment is delivered to Dealer as part of or all of the purchase price, Dealer may sell the used Equipment and retain the proceeds as liquidated damages for the Purchaser's default under this Paragraph.

11. TAX LIABILITY. Purchaser is liable for all sales, use or other taxes applicable to the Equipment purchase unless Purchaser is tax exempt or such payment is prohibited by law.

12. INSURANCE UNAVAILABILITY. If this Agreement includes a charge for credit life and disability insurance and if the insurance cannot be provided, Purchaser will receive a credit for the amount charged. The inability of the Dealer or any of its assignees to secure the insurance does not relieve Purchaser of its obligation to purchase the Equipment described in this Agreement. Purchaser is not required to purchase credit life and credit disability insurance.

13. FACTORY WARRANTY. Unless a Dealer warranty or service contract is furnished by Dealer to Purchaser, any warranty on any new Equipment is subject only the warranty made by Manufacturer. TO THE EXTENT PERMITTED BY LAW, DEALER DISCLAIMS ALL WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

14. USED EQUIPMENT SOLD TO PURCHASER. REGARDLESS OF WHETHER THE PURCHASE IS SUBJECT TO A MANUFACTURER'S WARRANTY, UNLESS THERE IS A SEPARATE DEALER WARRANTY FURNISHED BY DEALER TO PURCHASER, USED EQUIPMENT IS SOLD "AS IS" WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED. PURCHASER IS SOLEY RESPONSIBLE FOR THE COSTS TO REPAIR OR CORRECT ANY DEFECTS IN USED EQUIPMENT WHICH EXIST AT OR AFTER THE TIME OF PURCHASE.

15. LIMITATION OF LIABILITY. Dealer is not liable to Purchaser or any other party for any incidental, special, punitive, consequential or other damages arising out of the breach of this Agreement, including without limitation, damages for lost use, lost profits, or other commercial or economic loss, even if the damages are foreseeable or Dealer has been advised of the possibility of such damages. If Dealer is responsible for any damages, Purchaser's sole and exclusive remedy is limited to reimbursement of the payment for the piece of Equipment, at issue. This limitation applies regardless of whether the liability is based in contract, tort, strict liability or any other theory, and regardless of whether the alleged breach or default is material.

16. FINAL AGREEMENT. Time is of the Essence for each provision of this Agreement of which time is a factor. Upon acceptance and execution of this Agreement by the Purchaser and an authorized Dealer employee, the terms shall be final, complete, and the exclusive statement of the terms of this Agreement. This Agreement shall supersede any prior oral or written agreements or understandings. The Agreement may not be cancelled or modified without the Dealer's written consent.

17. TERMINATION OF THE AGREEMENT. Each of the following may constitute a termination event which allows Dealer in its sole discretion to terminate this Agreement for each piece of Equipment ordered, without notice, if: (i) Purchaser fails to purchase and or accept delivery of any piece of or all of the Equipment within 10 days after the scheduled delivery date(s); (ii) Purchaser fails to perform any of its obligations under this Agreement; and/or (iii) Purchaser consolidates or merges with any other person or entity. Dealer is not obligated to provide and Purchaser waives advance notice of termination. If Purchaser is in default or if this Agreement is terminated prior to the purchase of any Equipment, Dealer is a secured creditor under the Michigan Uniform Commercial Code. Purchaser authorizes Dealer to file a financing statement with a secured interest in the Equipment. Purchaser grants Dealer an irrevocable power to attorney to take all actions necessary to establish, maintain and continue Dealer's perfected security interest or title in the Equipment.

18. ARBITRATION. Any claim, breach or dispute arising from or in connection with this Agreement or otherwise impacting the validity, enforceability, or termination of this Agreement shall be resolved by binding arbitration administered by the Transportation ADR Council. The arbitration shall be conducted in accordance with the then effective Rules of the Transportation ADR Council and as set forth in this Paragraph. Claims shall be heard by a single arbitrator, selected by the parties. Grand Rapids, Michigan is the place for arbitration. The arbitration will be governed by Michigan law, without regard to Michigan choice of law rules. If the dispute is less than $50,000, including any counterclaims, there shall be no discovery other than the exchange of documents. If the dispute is over $50,000, discovery shall be as mutually agreed by the parties or as determined by the arbitrator. Regardless of the amount of the claim, the arbitration will be based on the submission of documents and there shall be no in-person or oral hearing. Time is of the essence for arbitration under this Agreement and arbitration hearings shall take place within 90 days from date the claim is filed. Awards will be rendered within 120 days from the date the claim is filed. The Arbitrator shall agree to these limits prior to accepting appointment. The losing party is responsible for paying the prevailing party's attorney's, witness and expert fees and costs, legal expenses and pre and post judgment interest, arbitration costs and administrative fees. The arbitrator's award shall be in writing and will include the rationale for the decision. Except to the extent that a party's damages constitute amounts required to be paid to a third party, the arbitrator's award shall not include non-economic or exemplary damages or damages for lost profits or income. An arbitrator's award may be entered in the circuit courts of Kent County, Michigan. Except as may be required by law, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration without the prior written consent of both parties.

19. MISCELLANEOUS. No course of dealing, performance, trade usage or failure to enforce any term or condition will modify this Agreement. The remedies expressly provided in this Agreement are in addition to other remedies Dealer may have under the Uniform Commercial Code or other applicable law. This Agreement is governed by the laws of Michigan, without regard to the conflict or choice of laws. This Agreement may be amended in writing, signed by a duly authorized representative of Dealer and delivered to Purchaser. Purchaser is responsible for any costs of collection, including but not limited to attorney and collection agency fees and court costs, to collect any amount owed under this Agreement.

20. FORCE MAJEURE. Dealer's delivery of Equipment and obligations under this Agreement may be delayed, suspended or terminated based upon unanticipated events beyond the Dealer's control, such as Act(s) of God, pandemic(s), laws, executive orders, regulations, labor trouble, strikes, lockouts or injunctions, intervening events of third parties or event(s) which makes the manufacture, transportation, acceptance or delivery of the Equipment commercially impractical or unprofitable. If, because of any such event, it is commercially impractical for Dealer to deliver the Equipment within 3 consecutive months from the Equipment delivery date, Dealer may cancel this Agreement with 5 days written notice. If terminated pursuant to this Paragraph, Purchaser's sole remedy against Dealer is a return of any deposit and payments made. Purchaser waives all other remedies.

INITIAL HERE

# EXHIBIT "B"

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

Case 8:26-cv-01613-CAS-PD    Document 1-1    Filed 06/23/26    Page 14 of 14    Page ID #:21



# PERSONAL GUARANTY

**Equipment Financing Agreement #** 439418-000

**THIS PERSONAL GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS.** When we use the words **you** and **your** in this Personal Guaranty, we mean the **Personal Guarantor (s)** indicated below. When we use the words **we, us** and **our** in this Personal Guaranty, we mean **AMERIS BANK dba BALBOA CAPITAL,** its successors and assigns.

In consideration of our entering into the equipment financing agreement above ("EFA"), you unconditionally and irrevocably guarantee to us, our successors and assigns, the prompt payment and performance of any and all obligations of the Customer ("Debtor") under the EFA and any other financial transaction of any kind whatsoever, whether now existing or hereafter arising with us. You agree that this is a guaranty of payment and not of collection, and that we can proceed directly against you without first proceeding against the Debtor or against the Equipment covered by the EFA or against any collateral or security held by us. You waive all defenses and notices, including those of protest, presentment and demand. You agree that we can renew, extend or otherwise modify the terms of the EFA and you will be bound by such changes. If the Debtor defaults under the EFA, you will immediately perform all obligations of the Debtor under the EFA, including, but not limited to, paying all amounts due under the EFA. You will pay to us all expenses (including attorneys' fees) incurred by us in enforcing our rights against you or the Debtor. This is a continuing guaranty that will not be discharged or affected by your death and will bind your heirs and personal representatives. You waive any rights to seek repayment from the Debtor in the event you pay us. If more than one personal guarantor has signed this Personal Guaranty, each of you agree that your liability is joint and several. You authorize us or any of our affiliates to obtain credit bureau reports regarding your personal credit, and make other credit inquiries that we determine are necessary.

**THIS PERSONAL GUARANTY IS GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA. YOU CONSENT TO THE JURISDICTION OF THE COUNTY OF ORANGE IN THE STATE OF CALIFORNIA. YOU HEREBY EXPRESSLY WAIVE THE RIGHT TO TRIAL BY JURY.**

**"Delivery of this document bearing a facsimile signature or signatures shall have the same force and effect as if the document bore an original signature."**

sign ➤ X  _eSigned By:_ STIVI VUKTILAJ                    Jan 27, 2023 11:04:07 AM PST

_____        01/27/2023
**Name**                                 _____
                                         **Date**

[REDACTED]

**Home Street Address, City, State, Zip Code**

[REDACTED]                               [REDACTED]

**Social Security Number**               **Phone Number**

EFA251B

